# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

VICTOR CORNELL MILLER,      )
                                   )
          **Petitioner,**      )
                                   )
**v.**                          )       **Case No. 15-CV-0703-JED-JFJ**
                                   )
**JOE ALLBAUGH,[1]**      )
                                 )
          **Respondent.**     )

## OPINION AND ORDER

Petitioner Victor Cornell Miller, a state inmate appearing *pro se*, filed a 28 U.S.C. § 2254 petition for writ of habeas corpus (Doc. 1) to challenge the judgment and sentence entered against him in the District Court of Tulsa County, Case No. CF-1999-4583. Respondent filed a response in opposition to the petition (Doc. 18) and provided the state court record (Docs. 18, 19)[2] necessary to adjudicate Petitioner's claims. Petitioner filed a reply (Docs. 25, 26) to the response. For the reasons that follow, the Court denies the habeas petition.

---

[1] Petitioner is currently incarcerated at Lawton Correctional Facility, a privately-operated prison. Joe Allbaugh, Director of the Oklahoma Department of Corrections, is therefore substituted in place of Jerry Chrisman as party respondent. *See* Rule 2(a), *Rules Governing Section 2254 Cases in the United States District Courts.* The Clerk of Court shall note this substitution on the record.

[2] For ease of reference, the Court will cite to the trial transcripts as follows, referring to the original page number in the upper-right hand corner of the transcript: Doc. __-__, Tr. Trial vol. __, at __. For all other documents, the Court will cite to the record by referring to the document number and page number identified in the CM/ECF header.

## BACKGROUND

In September 1999, Petitioner and John Fitzgerald Hanson were jointly charged with two counts of first-degree malice murder, in violation of OKLA. STAT. tit. 21, § 701.7(A) (1998 Supp.), or alternatively, first-degree felony murder, in violation of OKLA. STAT. tit. 21, § 701.7(B) (1998 Supp.), in the District Court of Tulsa County, Case No. CF-1999-4583, for the murders of Mary Agnes Bowles (Count I) and Jerald Thurman (Count II). *Miller v. State*, 313 P.3d 934, 941 (Okla. Crim. App. 2013) (*Miller II*).

Petitioner and Hanson were tried separately.[3] *Id.* Petitioner's case proceeded to a jury trial in April 2002, and the State sought the death penalty for both murders. *Id.* At the end of the guilt phase of the trial, the jury found Petitioner guilty as charged. *Id.* At the end of the penalty phase, the jury found the existence of four aggravating circumstances as to both murders. *Id.* at 941-42. The jury recommended a sentence of life without the possibility of parole for the murder of Bowles, thereby acquitting Petitioner of the death penalty on Count I, and recommended a death sentence for the murder of Thurman. *Id.* at 942 & n.2. The trial court adopted the jury's recommendations and sentenced Petitioner accordingly. *Id.* at 941.

Represented by counsel, Petitioner filed a direct appeal with the Oklahoma Court of

---

[3] Hanson was originally tried by a jury in May 2001, convicted for the murders of Bowles and Thurman, and sentenced to death for Bowles' murder and life without the possibility of parole for Thurman's murder. *Miller II*, 313 P.3d at 941. On direct appeal, the Oklahoma Court of Criminal Appeals (OCCA) affirmed Hanson's convictions and sentence of life without parole, but reversed his death sentence and remanded for resentencing. *Id.* Following the resentencing trial in January 2006, Hanson was resentenced to death for Bowles' murder. *Id.* The OCCA affirmed Hanson's death sentence on appeal. *Id.*; *see Hanson v. State*, 206 P.3d 1020 (Okla. Crim. App. 2009).

Criminal Appeals (OCCA). In a published opinion filed September 17, 2004, in Case No. D-2002-782, the OCCA found that the State violated Petitioner's constitutional rights to confront and cross-examine the witnesses against him by (1) allowing Rashad Barnes to testify regarding statements Hanson made to Barnes that implicated both Hanson and Petitioner in the double-homicide and (2) limiting Petitioner's cross-examination of Barnes. *Miller v. State*, 98 P.3d 738, 743, 748 (Okla. Crim. App. 2004) (*Miller I*). The OCCA determined that these errors were not harmless beyond a reasonable doubt, reversed Petitioner's convictions and sentences, and remanded his case for a new trial. *Id.* at 749.

Petitioner was retried on both counts of first-degree murder in November 2008. *Miller II*, 313 P.3d at 942. On retrial, the State again sought the death penalty for both murders. *Id.* The OCCA summarized the evidence presented at Petitioner's 2008 trial as follows:[4]

> On August 31, 1999, Mary Bowles, who was 77 years old, worked her regular volunteer shift at St. Francis Hospital in Tulsa. She clocked out at 3:51 p.m. Lucille Neville, a pharmacy technician at the hospital and longtime friend of Bowles, testified that Bowles' car—a 1993 tannish/gold-colored Buick LeSabre—was in front of her car that afternoon, going north on Yale Avenue. Bowles honked and waved at Neville while they both waited at a light, just before turning left onto the Skelly Bypass merge. The women parted ways when Bowles stayed on the service road, apparently going home. Bowles was scheduled to be back at the hospital at 9:30 a.m. the next morning. She never returned.
>
> That same afternoon James Lavendusky and his father, Ken Lavendusky, were winterizing James' boat at his Tulsa home at 6802 North Mingo Road.

---

[4] Under 28 U.S.C. § 2254(e)(1), the historical facts found by the state court are presumed correct. Following review of the state court record, including the trial transcripts, this Court finds that the OCCA's factual summary is adequate and accurate. Therefore, the Court adopts the following summary as its own. In adopting the OCCA's summary, the Court, like the OCCA, refers to Petitioner as Miller.

The Lavendusky home and pecan farm were across the road from a dirt pit owned by Jerald Thurman. James testified that around 5:45-6:00 p.m., he heard three or four gunshots coming from the area toward the dirt pit. After a few seconds, he heard three or four more shots. When James looked up, he noticed Thurman's dump truck parked between Mingo Road and the entrance gate into the dirt pit area. Shortly thereafter, Ken went to talk to Thurman about getting some gravel.

James testified that he continued working on his boat until his dad started yelling and waving for him to come over. When James arrived he found Thurman's dump truck still running. Ken told James that Thurman had been shot and handed James a cell phone to talk to a 911 operator. James then saw Thurman on his back on the ground near the gate. James testified that before going over to the dirt pit, he noticed a car leaving the area, headed south on Mingo. James described the car as a silver or grayish-colored four-door sedan. He noticed a driver and something "dark" in the back seat.

Jim Moseby, Thurman's nephew, was driving a dump truck for Thurman that day. Moseby testified that he received a call from his uncle around 5:50 p.m. Thurman told Moseby that there was a car in the dirt pit that had been lingering there, that he was concerned about it, and that if the car was still there when Thurman was ready to leave, he was going to lock the gate on his way out.

When Moseby arrived at the dirt pit a short time later, he was met by the Lavenduskys, who told him that Thurman had been shot. Moseby, who was also a certified EMT (emergency medical technician), testified that he found his uncle lying outside the gate, with his head at the base of the tree where the gate was attached. Thurman was breathing with difficulty, but was unconscious and bleeding from the right side of his head, as well as from his chest and hand. Thurman's cell phone was on the ground next to him. Moseby noted that the phone had a hole in part of it, apparently from a bullet going through it.

Jerald Thurman, who was 44 years old, never recovered consciousness and died from his injuries on September 14, 1999, at Hillcrest Hospital. The medical examiner determined that he had four gunshot wounds: one through the back part of his head (going from right to left and passing through his brain), one entering his back at the base of his neck, one that entered his upper left arm, and one through his right hand. The medical examiner concluded that the cause of Thurman's death was the gunshot wound to his head.

Sundeep Patel testified that on August 31, 1999, he was a student and worked as a desk clerk at the Oasis Motel, which was owned by his parents. Patel testified that he was watching Home Improvement that evening, which aired

between 6:00 and 6:30 p.m., when John Hanson came into the motel, asked about the price of a room, and then walked back out. Hanson returned a short time later and stated that his car wasn't starting, so he was going to need a room. Patel testified that Hanson then rented a room, using his actual name. After Hanson paid for the room, Patel gave him the key to Room 118, but to the best of Patel's knowledge, no one stayed in that room that night. Hanson also asked for tools to work on his car, and Patel loaned him some pliers and screwdrivers.

Patel testified that there was another man with Hanson that day, but acknowledged at trial that he had never been able to identify anyone as being that second man. Patel testified that both men were black, but that he was focused on Hanson, who was the one he dealt with and whose identity Patel confirmed with his driver's license. Patel testified that he "wasn't worried about the other person" and never interacted with him. Patel testified that the other man came in with Hanson when Hanson first inquired about a room, but did not come back inside. When Patel looked out to see what the men were doing with his tools, both men were outside the car doing something under the hood. Patel testified that the two men arrived in and were working on a "champagne-colored" Buick LeSabre and that the car remained parked in the Oasis Motel parking lot for more than a week, until it was towed off by Tulsa police.

Patel was cross-examined extensively about whether there was anything in the lobby that blocked his view of the second man and the fact that he originally described the second man as weighing about 250 pounds. (Victor Miller weighed approximately 180 pounds at the time.) . . . Patel's testimony and pictures of the Oasis Motel lobby in 1999 establish that Patel would have been behind a plexiglass window, which had some papers hanging on it about hotel policies, but that Patel would have been able to see anyone in the hotel's tiny lobby—if he had wanted to and was paying attention.

On September 2, 1999, Police were notified regarding the disappearance of Mary Bowles. Her body was discovered on September 7, 1999, in a ditch alongside 66th Street North in Tulsa, not far from North Mingo and Thurman's dirt pit. Bowles' body was significantly decomposed and skeletonized and had been subject to animal scavenger activity, to the point that it was not readily identifiable. However, investigating officers found an address book beneath the body with Mary Bowles' name on it, and her body was later conclusively identified through dental records. The medical examiner who examined Bowles' body concluded that she died as a result of multiple gunshot wounds.

On the morning of September 9, 1999, Bowles' car was spotted in the Oasis Motel parking lot by a Tulsa police officer and was towed off for processing.

A thorough search of the car revealed two bloodstains on opposite sides of the rear seat bench and a bloodstain in the middle of the rear area carpet, all of which were consistent with the DNA of Bowles. In addition, a fingerprint was found on the latch portion of the driver's seatbelt buckle, which was later determined to be from John Hanson's right thumb, and another fingerprint was found on the latch portion of the seatbelt buckle for the front passenger's seat, which was later determined to be from Victor Miller's right thumb.

Also on September 9, 1999, Hanson and Miller were arrested at the Muskogee EconoLodge Motel, after an anonymous tip was called in to Tulsa police by Miller's wife, Phyllis Miller. Two loaded guns were found in the tank of the toilet in their motel room: a silver Taurus .38-caliber Special revolver ("the silver .38" or "the silver revolver") and a Starfire black 9-mm Luger semi-automatic pistol ("the black 9-mm"). The silver .38 (State's Exhibit 52) was later matched to the two bullets recovered from Thurman's body, while the black 9-mm (State's Exhibit 53) was later matched to the bullet recovered from Bowles' body, as well as to two spent 9-mm cartridges found near her body and a spent 9-mm bullet found buried in the dirt underneath her body.

The State put on evidence at trial regarding certain armed robberies committed by Miller and Hanson around the time of August 31, 1999, in order to establish that the silver .38 was customarily used and carried by Miller, while the black 9-mm was customarily used and carried by Hanson. The trial court limited the breadth and content of this "other crimes" evidence, however, and repeatedly admonished the jury, before the evidence was presented, that the evidence regarding these other robberies was to be considered "solely on the issue of the defendant's alleged identity."

This evidence established that on August 23, 1999, Hanson and Miller robbed the Apache Junction Liquor Store, and Miller acquired the silver .38 during this robbery. The clerk at the time testified that Miller held a gun to her chest while he demanded the store's cash and that Miller later discovered the silver .38 under the counter and took it. In addition, the transcript testimony of unavailable witness Bettye Brimmer, a former clerk at a Tulsa Dreamland Video Store, was presented at Miller's retrial to establish that on September 3, 1999, during a robbery of the video store by Miller and Hanson, Miller held Brimmer at gunpoint with a silver revolver, while forcing her to put the store's money into a bag. The State also established that on September 7, 1999, Miller used a silver revolver (that looked like State's Exhibit 52) to help Hanson rob a Signature Loan Service and then used duct tape to constrain the hands and feet of two employees there. Finally, the State established that on September 8, 1999, Hanson used a black 9-mm and Miller used a silver .38 to rob the Tulsa Federal Employees Credit Union. Miller and Hanson robbed two separate tellers at the same time that day, but

the teller robbed by Hanson was able to slip a dye pack into the manila envelope of money that she gave to Hanson.

Phyllis Miller, Victor Miller's estranged wife, testified at his retrial regarding the events of the summer of 1999. Phyllis listed the various places she and her husband lived that summer and testified that by the end of August, they were staying at a Motel 6 in west Tulsa. Phyllis testified that during that time period, Hanson carried a black semi-automatic 9-mm, and she identified State's Exhibit 53 as Hanson's gun. Phyllis likewise testified that just before they moved into the Motel 6, Miller began carrying a silver revolver, and she identified State's Exhibit 52 as Miller's gun. Phyllis testified that Miller got this gun by taking it from the Apache Junction Liquor Store and that he always kept this gun with him during the time that they were living at the Motel 6. She also testified that both men carried their guns by putting them in the side waistband of their pants.

Phyllis testified that around 3:00 p.m. on August 31, 1999, she and Miller got into a loud argument in the Motel 6 parking lot about who was going to use their car that day. She testified that Miller wanted to take their car, which was an Oldsmobile, but that she needed it to pick up her sons from school, who got out around 3:15 or 3:30 p.m. Phyllis testified that Miller ultimately got so mad he "pulled my wires out of my car," so it wouldn't start, and that she had to call the school and ask that her sons be instructed to take a city bus home. Phyllis testified that around this same time, John Hanson arrived on a city bus. Phyllis testified that when she returned to the parking lot, after going inside to call the school, Miller and Hanson were gone, as was a van owned by Sherry Carter. Carter was Miller's friend and was also living at the Motel 6 at the time. Phyllis testified that Miller had the silver revolver with him that day.

Phyllis testified that it was after midnight when Miller and Hanson finally returned to the motel. Phyllis testified that Miller still had the silver revolver and was acting "[r]eal nervous, looking out the window, thinking somebody's out there, pacing the floor." Phyllis testified that Hanson got a different room at the motel, but that Miller stayed with her and put the silver revolver under his pillow. Phyllis testified that the next morning, Miller put the wires back on their car and asked her to take him to the Oasis Motel. When they got there, Miller took a blue rag and walked over to a beige-gold-looking car that was parked in the motel parking lot. Phyllis testified that Miller got in the car through the driver's door, began moving around and wiping things down with the blue rag, and then got back out a few minutes later using the same door. When Miller returned, he was carrying the blue rag and some cassette tapes and told her to "take off." Phyllis testified that they then returned to the Motel 6 and that she and Miller went their separate ways.

Phyllis also testified about a later occasion, when she was recruited to help Miller and Hanson rob a bank by buying them a pack of manila envelopes and then acting as the getaway driver. She described the area where she was told to park (near the Tulsa Federal Employees Credit Union) and that after a while, the men came running back, got in the car, and told her to take off. Phyllis testified that she heard a "pop," which was a red dye pack going off in Hanson's bulging manila envelope of cash, and that Miller chided Hanson for "letting the lady put a pack in there." Miller then instructed her to take them to Muskogee, and they went to the home of some of his relatives, where Miller talked about the robbery. Phyllis testified that she and Miller then got into another big fight, because he wanted to take their car and leave her there, which made her mad, and that Miller then disabled their car, "tore everything up in it," and left with Hanson.

Phyllis testified that she got a tow truck to take her and the car back to Tulsa and that she made note of two Muskogee motels nearby, an EconoLodge and a Holiday Inn. Phyllis testified that she knew Miller and Hanson were headed to a motel and had already decided that she was going to call the police and turn them in, which she did. Phyllis called the Tulsa police late that same night. She called [a]gain the next morning, which was September 9, 1999, after seeing a picture of the car that Miller had wiped down at the Oasis Motel on the news, in connection with a report about a missing elderly woman.

Victor Miller testified in his own defense at trial. He began his direct testimony by acknowledging that he had "suffered felony convictions on many occasions." He admitted having felony convictions in five different state cases and also to 16 federal felony convictions, as a result of the series of armed robberies that he committed with John Hanson during the summer of 1999. Miller testified that he was serving a total sentence of Life plus 157 years for these federal convictions.

Miller acknowledged Phyllis Miller as his wife and admitted the truth of the overwhelming majority of her testimony about him, including her testimony about the places they had lived, their relationship, and Phyllis' participation in some (but not all) of the armed robberies that he had committed. Miller testified that he and Hanson robbed the Apache Liquor Store on August 23, 1999, and volunteered that he had robbed that same liquor store, without Hanson's help, back in January of 1999. Miller testified that the silver .38 revolver was obtained during the August robbery of Apache Liquor, but maintained that it was Hanson who stole this gun—and that the cashier was "mistaken" when she said it was [Miller]. He admitted that the silver .38 ended up in his Oldsmobile on the day it was stolen and that Phyllis saw it in their car that day, when it slid up from underneath his seat, after he picked her up. Miller emphasized, however, that Hanson normally kept the silver .38, since Hanson would keep the guns used for their robberies and bring

them in a brown paper sack when they were needed.

Miller acknowledged the loud argument that he had with Phyllis in the Motel 6 parking lot, but he described the date of this argument as "just about three days before I got arrested," which would have been September 6, 1999. Miller testified that Phyllis had been gone for much of the day, returning around 1:00 p.m., and that he was very angry with her because he wanted to use their car to "go plan some illegal activities" with Hanson, i.e., plan some bank robberies. Miller testified that the disagreement started inside, went on for a long time, got intense and loud, and eventually moved outside. Miller admitted that he ultimately pulled the spark plug wires out of their car, so Phyllis would not be able to drive it, and that he and Hanson left in Sherry Carter's van.

Although Miller maintained that his loud argument with Phyllis occurred on approximately September 6, 1999, i.e., well after the day of the murders on August 31, he also testified about where he was between the time he left that afternoon and the time he returned late that night. He described stopping at a liquor store to get malt liquor and beer to drink and then getting dropped off with Hanson at the home of Rashad Barnes in North Tulsa. Miller testified that they went out back and that he sat down "under the shade tree and started drinking my beer and thinking." Later, though Miller had no idea when, he and Hanson took a bus to downtown Tulsa and then he (but not Hanson) transferred to a different bus that took him back to the Motel 6. Miller testified that he arrived back at the Motel 6 while it was still daylight, but that he didn't want Phyllis to "make a scene," so he went to a store, bought some cold beer, and then spent hours alone outside the motel— "just sitting out there drinking and smoking cigarettes and thinking." He testified that Hanson arrived at the motel in a cab around sunset and that he and Hanson then went to Sherry Carter's room, where he drank more beer and got high on cocaine. Thus Miller's defense was essentially that if the argument with Phyllis was on August 31, he was busy "drinking and thinking" at the time of the murders.

Miller, like Phyllis, testified that the day after their big fight, he put the spark plug wires back on their car, and Phyllis drove him to the Oasis Motel, where the Buick LeSabre was parked. Miller testified that Hanson had called that morning and asked him to try to start that particular car and that Phyllis drove him to Barnes' place in North Tulsa, in order to get the car keys from Hanson. Miller testified that he had experience working on cars, described himself as "a shade-tree mechanic's apprentice," and noted that Hanson was aware of his experience with cars—and that Hanson himself did not have any "skills" in this area. Miller acknowledged that as he approached the Buick, he was carrying a blue rag, although his task was to try to get the car started.

Miller testified that the car wouldn't start with the key and that he then tried looking for a "kill switch," which could be preventing the car from starting. He testified that he tried pushing the signal lever forward, tried the gearshift, tried the parking brake and regular brake, and then even tried buckling the seatbelts. Miller testified that when all of these attempts failed, he gave up and began using the blue rag to wipe down everything he had touched, because he knew Hanson did not own a car, and he did not want to be "connected" to this one. Miller testified that Phyllis then drove him to return the keys to Hanson. On cross-examination, Miller specifically conceded that it was his fingerprint that was found on the latch of the passenger-side seatbelt buckle of Bowles' car.

Miller's testimony about the events leading up to his arrest was largely consistent with the testimony of State witnesses. Miller acknowledged his participation in the September 8, 1999 armed robbery of the Federal Employees Credit Union and did not seriously contest any of the State's evidence in this regard—except that he insisted that the dye pack in Hanson's envelope exploded just after they exited the credit union, rather than back in the car with Phyllis. Miller testified that they drove to his cousin's house in Muskogee afterward, that they divided up the money among the three of them, that he and Phyllis "got into quite a fuss" there, and that he and Hanson left her at the house in Muskogee, intending to buy a new car, because Miller saw someone writing down the license plate of the Oldsmobile just after the Credit Union robbery.

Regarding the murders of Jerald Thurman and Mary Bowles, however, Miller adamantly denied being involved or present and also denied having any knowledge, at the time, regarding what had happened. On cross examination, Miller admitted that the State had "proven" that the silver .38 revolver found at the EconoLodge was the gun that killed Thurman. He also acknowledged that "numerous witnesses" had testified to seeing him using this gun and even that he would carry the silver .38 "[w]hen we went to go do a robbery." Miller likewise testified that he "believed" the State's evidence establishing that the black 9-mm found at the EconoLodge was the gun that killed Bowles and that this same gun was "the gun that John Hanson carried on a regular basis." Miller also acknowledged that these two guns, i.e., the murder weapons, were found in the toilet tank of the EconoLodge room that he shared with Hanson (and no one else). Nevertheless, Miller denied any involvement in the murders and denied ever having the silver .38 with him on the day he fought with Phyllis at the Motel 6. Miller also denied having any knowledge about whether Hanson was involved.

*Miller II*, 313 P.3d at 943-49 (footnotes and paragraph numbers omitted).

At the conclusion of the guilt phase of Petitioner's 2008 trial, the jury found Petitioner guilty on both counts of first-degree murder, under both alternative theories (malice and felony murder). *Miller II*, 313 P.3d at 942. At the conclusion of the penalty phase, the jury found the existence of four aggravating circumstances as to both convictions: (1) Petitioner was previously convicted of a felony involving the use or threat of violence, (2) Petitioner knowingly created a great risk of death to more than one person, (3) the murder was committed for the purpose of avoiding or preventing lawful arrest or prosecution, and (4) there is a probability Petitioner would commit criminal acts of violence that would constitute a continuing threat to society. *Id.* at 942 & n.6; *see* OKLA. STAT. tit. 21, § 701.12(1), (2), (5), and (7). The jury recommended a death sentence for both murders, and the trial court sentenced Petitioner accordingly. *Id.* at 942.

Following his 2008 trial, Petitioner filed a direct appeal with the OCCA. *Id.* Through counsel, Petitioner asserted 23 propositions of error. Doc. 18-1, Pet'r App. Br., at 2-9.[5] Petitioner also filed a *pro se* supplemental brief asserting three propositions of error. Doc. 18-3, Pro Se App. Br., at 2-3. In a published opinion filed September 6, 2013, in Case No. D-2008-1206, the OCCA found two constitutional errors occurred during the guilt phase, determined those errors—considered individually and collectively—were harmless beyond a reasonable doubt, and affirmed Petitioner's murder convictions. *Miller II*, 313 P.3d at 986. The State conceded, and the OCCA found, that the State's decision to

---

[5] Petitioner's state appellate brief, filed by counsel, lists 24 propositions of error, but the body of the brief omits Proposition 20. *See* Doc. 18-1, at 100-01; *see also* Doc. 18, at 2-5 & n.2; *Miller II*, 313 P.3d at 145, n.154.

11

seek the death penalty for the murder of Bowles (Count I) at Petitioner's second trial violated Petitioner's right to be free from double jeopardy because Petitioner had been acquitted of the death penalty on Count I during his first trial.[6] *Miller II*, 313 P.3d at 949-50. Based on the double jeopardy violation, the OCCA reversed Petitioner's Count I death sentence, and modified it to a sentence of life without the possibility of parole. *Id.* at 950. The OCCA found "multiple examples of serious error and also prosecutorial misconduct potentially impacting [Petitioner's death sentence on Count II (for the murder of Thurman)" and found that the cumulative effect of those errors could not be deemed harmless beyond a reasonable doubt, reversed the Count II death sentence, and remanded for resentencing on Count II. *Id.* at 999-1000.

On December 8, 2015, the trial court called the matter for resentencing. Doc. 19-23, Tr. Sent. Hr'g, at 1-2. The State notified the court that it had dismissed the bill seeking the death penalty for Count II, that the bill would "not ever be reinstated," and that the parties had agreed to waive their rights to a jury trial for resentencing. *Id.* at 2-4. Petitioner confirmed his decision to waive his right to a jury trial. *Id.* at 4. After hearing statements from three members of Thurman's family, a statement from Petitioner, and the State's

---

[6] The OCCA noted that the state court record "contains no argument or legal authority from the State regarding how or why it was authorized to re-seek the death penalty against Miller for the Count I murder of Mary Bowles—even though he had been 'acquitted' of the death penalty on this count at his first trial," that "the record is likewise silent regarding any objection from defense counsel to the State's action in this regard," and that "the record contains no evidence of any discussion before the trial court, comment by the trial court, or decision by the trial court regarding the fact that Miller had already been acquitted of the death penalty on Count I." 313 P.3d at 942.

sentencing recommendation, the trial court imposed a sentence of life without the possibility of parole for Count II and ordered it to be served consecutively to the sentence imposed in Count I. *Id.* at 5-15. Petitioner advised the trial court that he would waive his right to appeal from the resentencing. *Id.* at 17.

Petitioner filed the instant petition for writ of habeas corpus (Doc. 1) on December 10, 2015.

### DISCUSSION

Petitioner claims he is being held in violation of the United States Constitution and federal law because (1) the trial court refused to instruct the jury on the lesser included offense of accessory after the fact to first-degree murder, (2) trial counsel was ineffective, (3) the prosecutor knowingly used false and perjured testimony, (4) "pervasive prosecutorial misconduct" deprived him of a fair trial, (5) the State violated his right to be free from double jeopardy by subjecting him to double punishment, (6) the trial court erroneously admitted prejudicial "other crimes" evidence, and (7) the trial court lacked jurisdiction because the State violated the Interstate Agreement on Detainers Act. Doc. 1, at 4-25.

Respondent contends Petitioner is not entitled to federal habeas relief because 28 U.S.C. § 2254(d) bars relief on claims one through five and Petitioner fails to present cognizable habeas claims in claims six and seven. Doc. 18, at 26-97.

### I.    Timeliness and exhaustion

In most cases, a state prisoner must file a federal habeas petition within one year of the date on which his state judgment became final. 28 U.S.C. § 2244(d)(1)(A). In addition,

before seeking federal habeas relief, a state prisoner must exhaust available state-court remedies, *id.* § 2254(b)(1)(A), by "fairly present[ing] the substance of his federal habeas claim[s] to state courts," *Hawkins v. Mullin*, 291 F.3d 658, 668 (10th Cir. 2002).

Following review of the record and the parties' briefs, the Court finds that the petition is timely and that Petitioner exhausted available state remedies as to each claim asserted in his petition by presenting claims one through six to the OCCA through his direct appeal, in Case No. D-2008-1206, and by presenting claim seven through his petition for extraordinary relief, in Case No. PR-2007-0637.

## II.     Standard of review

Because the OCCA adjudicated the merits of Petitioner's federal claims, the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), guides this Court's review of those claims. *Hooks v. Workman*, 689 F.3d 1148, 1163 (10th Cir. 2012). When a state court adjudicates the merits of a state prisoner's federal claim, a federal court may grant habeas relief only if the prisoner first demonstrates that the state court's adjudication of the claim either "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law," 28 U.S.C. § 2254(d)(1),[7] or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2); *see also Kernan v.*

---

[7] As used in § 2254(d)(1), the phrase "clearly established Federal law" means "the governing legal principle or principles" stated in "the holdings, as opposed to the dicta, of [the United States Supreme Court's] decisions as of the time of the relevant state-court decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (quoting *Terry Williams v. Taylor*, 529 U.S. 362, 412 (2000) (*Terry Williams*)).

*Hinojosa*, 136 S. Ct. 1603, 1604 (2016) (per curiam) (reiterating that "[i]f the state courts adjudicate the prisoner's federal claim 'on the merits,' § 2254(d), then AEDPA mandates deferential, rather than *de novo*, review, prohibiting federal courts from granting habeas relief" unless the prisoner makes the requisite showings under 2254(d)).

If a state prisoner's federal claim is subject to review under § 2254(d)(1), the federal court's first task is to identify the Supreme Court precedent governing that claim. *House v. Hatch*, 527 F.3d 1010, 1018 (10th Cir. 2008). "The absence of clearly established federal law is dispositive under § 2254(d)(1)." *Id.* However, if clearly established federal law exists, the federal court must "ask whether the state court decision is either contrary to or an unreasonable application of such law." *Id.*

"A state-court decision is contrary to clearly established federal law . . . if it 'applies a rule that contradicts the governing law set forth in Supreme Court cases or confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from that precedent.'" *Smith v. Duckworth*, 824 F.3d 1233, 1241 (10th Cir. 2016) (quoting *Ryder ex rel. Ryder v. Warrior*, 810 F.3d 724, 739 (10th Cir. 2016)). "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'" *Terry Williams*, 529 U.S. at 405 (citing Webster's Third New International Dictionary 495 (1976)). Significantly, in adjudicating a federal claim the state court need not cite, or even be aware of, controlling Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002); *see also Harrington v. Richter*, 562 U.S. 86, 100 (2011) (explaining that AEDPA deference

15

applies even if a state court summarily denies a federal claim because "§ 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits'").

A state-court decision involves an unreasonable application of clearly established federal law "if the decision 'correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case.'" *Fairchild v. Trammell*, 784 F.3d 702, 711 (10th Cir. 2015) (quoting *Terry Williams*, 529 U.S. at 407-08). "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). An unreasonable application of clearly established federal law may also arise "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Terry Williams*, 529 U.S. at 407. In either case, an unreasonable application must be "objectively unreasonable", *id.* at 409, "not merely wrong," *White v. Woodall*, 572 U.S. 415, 419 (2014).

Unlike the inquiry under § 2254(d)(1), which focuses on the state court's legal analysis, the inquiry under § 2254(d)(2) focuses on the state court court's "determination of the facts." *See House*, 527 F.3d at 1015 ("Subsection (d)(1) governs claims of legal error while subsection (d)(2) governs claims of factual error."). "[W]hen a federal habeas petitioner challenges the factual basis for a prior state-court decision rejecting a claim," the federal court must determine whether the state-court decision rests on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

*Burt v. Titlow*, 571 U.S. 12, 18 (2013); 28 U.S.C. § 2254(d)(2). Under § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). A federal court must also presume the correctness of a state court's factual findings unless the petitioner rebuts the presumption "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).[8]

Ultimately, the AEDPA mandates that federal habeas courts give state court decisions the "benefit of the doubt," *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002), with respect to federal claims "already rejected in state proceedings," *Richter*, 562 U.S. at 102. Thus, when a federal claim is subject to review under § 2254(d), "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 102-03.

## III.    Analysis

### A.    Lesser-included-offense instruction (claim one)

Petitioner claims he was deprived of his constitutional right to a fair trial because the trial court refused his request to instruct the jury on the lesser included offense of

---

[8] The Supreme Court has stated that the standard set out in § 2254(e)(1) is "arguably more deferential" than the one set out in § 2254(d)(2). *Wood*, 558 U.S. at 301. But the Supreme Court has "not defined the precise relationship between § 2254(d)(2) and § 2254(e)(1)," *Burt*, 571 U.S. at 18, or offered clear guidance "on the question of how §§ 2254(d)(2) and (e)(1) fit together." *Wood*, 558 U.S. at 300.

accessory after the fact to first-degree murder.[9]  Doc. 1, at 4-5; Doc. 25, at 19-25; *see* Doc. 19-19, Tr. Trial, vol. 8, 2174-75 (denying request for jury instruction).

The OCCA applied state law to reject Petitioner's claim that the trial court abused its discretion in refusing to give the requested instruction.  *Miller II*, 313 P.3d at 980-81. Citing *Glossip v. State*, 29 P.3d 597, 603-04 (Okla. Crim. App. 2001), the OCCA stated that a "trial court has a duty to instruct on all lesser-included and lesser-related offenses that are supported by the evidence and that a defendant is entitled to have an instruction on his or her theory of defense if it is supported by the evidence and is tenable as a matter of law."  *Miller*, 313 P.3d at 981.  The OCCA agreed with the trial court that the instruction was not warranted by the evidence.  *Id.*  The OCCA reasoned,

> Miller's defense at trial was that he was totally innocent of the 1999 murders of Bowles and Thurman and that he did not know anything about the murders at the time or shortly afterward—not that he was an "accessory after the fact." Even at his 2008 retrial, Miller claimed he had "no idea" whether Hanson was involved in the murders.  Although Miller's testimony about wiping down Bowles' car—at the request of Hanson and at a time when Miller knew that Hanson did not own a car—could possibly support an instruction on accessory after the fact to theft of a motor vehicle, but the evidence did "not establish a prima facie case of accessory after the fact to first-degree murder. The evidence did not suggest that Miller had no involvement in the murders, but then later learned that Hanson was involved, and then wiped down Bowles' car at Hanson's request, with the intent that Hanson "avoid or escape from arrest, trial, conviction, or punishment."

*Id.* at 981.  In addition, the OCCA distinguished *Glossip*, noting that, in that case, the

---

[9] Under Oklahoma law, "[a]ll persons who, after the commission of any felony, conceal or aid the offender, with knowledge that he has committed a felony, and with intent that he may avoid or escape from arrest, trial, conviction, or punishment, are accessories." OKLA. STAT. tit. 21, § 173 (1991).  The OCCA described this crime as a "lesser-related offense" of first-degree murder.  *Miller II*, 313 P.3d at 980.

OCCA "declared that the defendant's jury should be been instructed upon Glossip's chosen defense of accessory after the fact to first-degree murder" because, unlike Petitioner's assertion that he had no knowledge of Hanson's involvement in the murders, Glossip's theory of "defense at trial was that he learned of the murder after the fact, failed to tell police what he knew, and assisted the killer 'by helping conceal the murder scene.'" *Id.* (quoting *Glossip*, 29 P.3d at 599, 604).

Petitioner contends the OCCA's adjudication of this claim resulted in a decision that is (1) contrary to clearly established federal law, (2) involved an unreasonable application of clearly established federal law, and (3) based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Id.* at 5.

For several reasons, the Court finds that Petitioner is not entitled to habeas relief on claim one. First, to the extent Petitioner contends the OCCA "disregarded state law" in reaching its decision, Doc. 1, at 5, he fails to present a cognizable federal habeas claim. A federal court may grant habeas relief to a state prisoner only on the ground that the prisoner's conviction or sentence was obtained or is being enforced "in violation of the Constitution, laws, or treaties of the United States." 28 U.S.C. § 2254(a); *see Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) ("[I]t is only noncompliance with *federal* law that renders a State's criminal judgment susceptible to collateral attack in the federal courts").

Second, to the extent Petitioner claims the trial court's failure to give a lesser-included-offense instruction generally deprived him of due process under various Supreme Court precedents, *see* Doc. 25, at 21-25, or specifically violated the rule established in *Beck v. Alabama*, 447 U.S. 625 (1980), *see id.* at 19-20, it appears his claim is not subject to

federal habeas review. In *Beck*, the Supreme Court "held that the death penalty may not be imposed 'when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict." *Bobby v. Mitts*, 563 U.S. 395, 397 (2011) (quoting *Beck*, 447 U.S. at 627). But the *Beck* Court declined to "decide whether the Due Process Clause would require the giving of such instructions in a noncapital case." 447 U.S. at 638 n.14. As a result, the United States Court of Appeals for the Tenth Circuit has "establish[ed] a rule of 'automatic non-reviewability' for claims based on a state court's failure, in a non-capital case, to give a lesser included offense instruction." *Dockins v. Hines*, 374 F.3d 935, 938 (10th Cir. 2004) (quoting *Chavez v. Kerby*, 848 F.2d 1101, 1103 (10th Cir. 1988)). Assuming Respondent is correct that that rule applies here because Petitioner no longer faces a death sentence, *see* Doc. 18, at 27-31, Petitioner would not be entitled to habeas review, much less to habeas relief, on claim one.

Third, assuming that the rule of "automatic non-reviewability" does not apply in this case because Petitioner's case was tried as a capital case, nothing in Petitioner's state appellate brief or the OCCA's decision suggests that Petitioner fairly presented a *Beck* claim in state court. Doc. 18-1, Pet'r App. Br., at 55-57; *Miller II*, 313 P.3d at 980-81.[10] Thus, the Court agrees with Respondent that Petitioner failed to exhaust a *Beck* claim, *see*

---

[10] As Respondent points out, Petitioner primarily discussed state law in presenting the alleged instruction error to the OCCA and made only a "bare reference to the Fourteenth Amendment" in his state appellate brief. Doc. 18, at 26; *see* Doc. 18-1, Pet'r App. Br., at 55-57. Petitioner concedes that this was sufficient to exhaust a federal due process claim, Doc. 18, at 27, but argues Petitioner did not exhaust a *Beck* claim, *id.* at 27-28.

*Hawkins*, 291 F.3d 668, and that the OCCA would likely impose an adequate and independent procedural bar to reject that claim should Petitioner return to state court to exhaust it, *see* Doc. 18, at 29-30. Thus, assuming Petitioner could assert a *Beck* claim (absent a death sentence), he procedurally defaulted that claim.

Finally, even assuming Petitioner could overcome the procedural default of his *Beck* claim, he cannot make the requisite showings under § 2254(d) to obtain habeas relief. As previously stated, *Beck* "held that a trial court must instruct the jury in a capital case on a lesser included noncapital offense *if the evidence would support giving such an instruction*." *James v. Gibson*, 211 F.3d 543, 555 (10th Cir. 2000) (emphasis added). Applying state law that also requires a trial court to give a lesser included offense instruction if supported by the evidence, the OCCA determined that the evidence in this case did not support Petitioner's requested instruction on the offense of accessory after the fact to first degree murder. *Miller II*, 313 P.3d at 981. The OCCA's decision is neither contrary to nor an unreasonable application of clearly established federal law. Moreover, having reviewed the trial transcripts, the Court finds that the OCCA's conclusion that the evidence did not warrant the instruction is based on a reasonable determination of the facts in light of the evidence presented at trial.

For all of these reasons, the Court denies habeas relief on claim one.

### B.      Ineffective assistance of trial counsel

Next, Petitioner claims he was deprived of his Sixth Amendment right to the effective assistance of trial counsel. Doc. 1, at 5-7; Doc. 25, 25-50; Doc. 26, 1-19.

A criminal defendant has a Sixth Amendment right to the effective assistance of

counsel. U.S. Const. amend VI. To establish a deprivation of this right, the defendant must show (1) that counsel's performance was deficient in that it fell below an objective standard of reasonableness and (2) that counsel's deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To prove deficient performance, a defendant must overcome the strong presumption that counsel's conduct was constitutionally effective. *Id.* at 689. And, in determining whether a defendant has rebutted this presumption, a reviewing court must take every effort to "eliminate the distorting effects of hindsight" and "judge the reasonableness of counsel's alleged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* To establish prejudice, the defendant must show that, but for counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different. *Id.* at 694.

Significantly, on habeas review, this Court's task is not to determine whether counsel's performance was deficient and prejudicial. Rather, the Court must determine whether it was objectively reasonable for the state court—i.e., the "reviewing court" to reject the defendant's ineffective-assistance-of-counsel claim. *See Richter*, 562 U.S. at 101 (noting that on habeas review, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard.").

Here, Petitioner identifies 11 specific instances of deficient performance by trial counsel during the guilt phase of trial. He alleges that counsel provided ineffective assistance by (1) failing to object to the prosecutor's argument regarding a diminished

presumption of innocence, (2) failing to request a jury instruction advising jurors to separately consider the two murder counts, (3) failing to utilize available evidence to further impeach Phyllis Miller's testimony, (4) advising Petitioner to stipulate to prejudicial blood stain evidence found in Bowles' car, (5) erroneously advising and essentially compelling Petitioner to testify, (6) opening the door to improper and prejudicial closing arguments by the prosecutor regarding the length of his federal sentence, (7) failing to investigate and develop evidence supporting the defense, (8) improperly denigrating petitioner during direct examination by referring to his commission of armed robberies, (9) referring to the appellate process in the jury's presence, (10) failing to request a mistrial based on the state's knowing use of false testimony, and (11) bolstering the testimony of Sundeep Patel during closing argument. Doc. 1, at 6-7; Doc. 25, at 27-50; Doc. 26, 1-19.[11]

Applying *Strickland* and *Williams v. Taylor*, 529 U.S. 362 (2000), the OCCA thoroughly addressed each of trial counsel's alleged deficiencies and ultimately rejected Petitioner's ineffective-assistance-of-trial counsel claim. *See Miller II*, 313 F.3d at 982-86.

*First*, the OCCA found that the prosecutor's argument about the presumption of

---

[11] Petitioner also alleges, as he did in state court, that trial counsel was ineffective during the penalty phase of the trial for (1) failing to object to the prosecutor's improper argument that a sentence less than death would be meaningless, (2) failing to investigate, develop, and present mitigating evidence, and (3) failing to make a meaningful objection to the continuing-threat-to-society aggravator and failing to present rebuttal evidence as to that aggravator. Doc. 1, at 6-7. Respondent contends, and Petitioner acknowledges in his reply brief, that allegations relating to trial counsel's ineffectiveness during the penalty phase are "moot" now that he no longer faces a death sentence for either murder conviction. Doc. 18, at 39-40, 47, 51; Doc. 25, at 28-30, 36. Consequently, the Court will not consider these allegations in analyzing claim two.

innocence was improper but not sufficiently prejudicial to deprive Petitioner of a fair trial.[12] *Miller II*, 313 P.3d at 982. Thus, the OCCA found, Petitioner could not show that trial counsel's failure to object to the argument prejudiced the defense. *Id.*

*Second*, the OCCA found it was not plainly erroneous for the trial court to omit an instruction advising the jury to separately consider the charges. *Id.* at 980, 983. Thus, the OCCA concluded, trial counsel's failure to request the instruction was neither deficient nor prejudicial. *Id.* at 983.

*Third*, the OCCA found that trial counsel's alleged failure to use available evidence to further impeach Phyllis Miller was not supported by the record. *Miller II*, 313 P.3d at 983. The OCCA found that counsel's "cross-examination of Phyllis was extensive, thorough, and hard-hitting." *Id.* Thus, the OCCA determined, counsel was not "ineffective in his efforts to impeach Phyllis" and instead "was quite successful in impeaching Phyllis regarding her claim to remember that the argument [with Miller at the Motel 6] was on August 31, 1999." *Id.*

*Fourth*, the OCCA found that the record demonstrates that Miller "personally

---

[12] During the guilt-phase closing argument, the prosecutor stated:

Ladies and gentlemen, the presumption of innocence, which the defendant has under the Constitution, is a legal presumption that every criminal defendant has being charged with a crime. But it is what's called a rebuttable presumption, and that presumption of innocence only remains with him unless the evidence presented by the state of Oklahoma diminishes that beyond a reasonable doubt, and if the evidence beyond a reasonable doubt diminishes that presumption of innocence, then it no longer exists. The evidence presented to you in this case has done exactly that.

*Miller II*, 313 P.3d at 976; *see* Doc. 19-20, Tr. Trial vol. 9, at 2475-76.

agreed to stipulate" "that Bowles could not be excluded as a DNA contributor to the multiple bloodstains found in the backseat area of her car." *Id.* at 984. Thus, the OCCA concluded, Petitioner failed to show either deficient performance or prejudice. *Id.*

*Fifth*, the OCCA determined that the State did not induce Petitioner's testimony at his first trial by presenting the testimony of Rashad Barnes—testimony that the OCCA found on Petitioner's first direct appeal should have been excluded. *Miller II*, 313 P.3d at 984-85. Citing *Harrison v. United States*, 392 U.S. 219 (1968), the OCCA explained that the "Supreme Court [1] recognized the 'general evidentiary rule' that a defendant's testimony is admissible against him in later proceedings," and [2] identified an exception to that rule "if a defendant's testimony at his first trial was 'impelled' by the State's improper introduction of illegally obtained confessions." *Id.* at 984 (quoting *Harrison*, 392 U.S. at 222-24). Thus, the OCCA reasoned, it was not "incorrect or inadequate" for trial counsel to advise Petitioner that if he chose not to testify at the second trial, the State could admit Petitioner's former trial testimony. *Id.* at 984-85.

*Sixth*, the OCCA stated that trial counsel did not improperly "open[] the door" to prejudicial remarks by the prosecutor when counsel elicited testimony from Petitioner that he was serving "life plus 157 years" for federal crimes. *Miller II*, 313 P.3d at 985. The OCCA reasoned that it was "quite clear" from the trial transcript that trial counsel "made a strategic decision to inform the jury, during the guilt stage of this retrial, that [Petitioner] was already in federal prison and would never be released from custody." *Id.* The OCCA determined that counsel's strategy was not objectively unreasonable and, in any event, did not prejudice the Petitioner. *Id.*

*Seventh*, the OCCA rejected Petitioner's argument that trial counsel "should have done a better job of convincing his jury that it was *reasonable* to believe that [Petitioner] was looking for a 'kill switch' in Bowles' car when he, quite innocently, deposited his thumbprint on her front passenger seatbelt buckle." *Miller II*, 313 P.3d at 985. Petitioner testified at trial that Hanson gave him the keys to Bowles' car and asked him to "fix" the car because it would not start. Doc. 19-20, Tr. Trial vol. 9, at 2270-73. Petitioner testified that after several attempts to start the car, he searched for a "kill switch" which he described as "a device that's—that they put in cars in different places that if you don't perform a certain thing, it won't start." *Id.* at 2274. The OCCA stated, "[d]efense counsel argued, consistent with [Petitioner's] testimony, that [Petitioner's] fingerprint could have been left on the buckle while [Petitioner] was looking for a kill switch. It is not counsel's fault that the jury apparently rejected [Petitioner's] (implausible) testimony in this regard." *Id.* Thus, the OCCA concluded, Petitioner failed to show either deficient performance or prejudice relating to counsel's investigation, development and presentation of evidence to support the kill-switch defense.[13] *Id.*

*Eighth*, the OCCA determined that because the jury "already knew that [Petitioner]

---

[13] In rejecting this argument, the OCCA noted that Petitioner attached two articles to his *pro se* supplemental brief that Petitioner alleged would have supported his kill-switch defense. *Miller II*, 313 P.3d at 985 n.161. As the OCCA described, those articles, from 2009 and 2011, discuss a safety feature affecting radio controls and maximum driving speed that became standard in some Ford vehicles beginning in 2010. *Id.*; *see* Doc. 18-3, at 17-21. The Court finds it was objectively reasonable for the OCCA to conclude that trial counsel did not perform deficiently by failing to present this evidence at Petitioner's 2008 retrial to support his theory that Bowles' 1993 Buick LeSabre might have had a kill switch installed on the front passenger seatbelt buckle.

was involved in a string of armed robberies during 1999," it was neither deficient nor prejudicial for trial counsel to ask Petitioner, on direct examination, to "tell us a little bit about the work that you were doing back in 1999 other than robberies." *Miller II*, 313 P.3d at 985.

*Ninth*, the OCCA noted that, when asked by the trial court if Petitioner would waive the recording of the jury instructions, trial counsel replied, "Your Honor, we would like to, but my appellate staff would not approve of that, so we can't." *Id.* But the OCCA rejected Petitioner's "argument that this statement somehow conveyed to the jury defense counsel's belief that [Petitioner] was guilty." *Id.* Thus, the OCCA concluded, trial counsel's remark neither constituted inadequate performance nor resulted in prejudice. *Id.*

*Tenth*, because it had already rejected Petitioner's claim that the prosecutor knowingly presented "false" testimony from Sundeep Patel, the OCCA found that trial counsel was not deficient for failing to request a mistrial regarding the admission of Patel's testimony because that request would have been denied. *Id.* at 985-86.

*Eleventh*, the OCCA rejected Petitioner's argument that trial counsel improperly bolstered Patel's testimony by telling the jury in closing argument "that Patel 'wasn't trying to lie to anybody." *Id.* at 986. The OCCA concluded that Petitioner failed to establish either deficient performance or prejudice stemming from this comment. *Id.*

Petitioner contends that the OCCA's decision on his ineffective-assistance-of-counsel claim was contrary to, and involved an unreasonable application of, clearly established federal law and was based on an unreasonable determination of the facts in light of the evidence presented in state court. Doc. 1, at 6; Doc. 25, at 25-26.

The Court disagrees. First, because the OCCA correctly identified *Strickland* as the clearly established federal law governing Petitioner's claim, Petitioner cannot show that the OCCA's decision is "contrary to" clearly established federal law. *See Terry Williams*, 529 U.S. at 405 (discussing meaning of "contrary"). Second, as set forth above, the OCCA applied *Strickland* in an objectively reasonable manner by addressing each of Petitioner's allegations of ineffectiveness to determine (1) whether counsel performed deficiently and (2) if so, whether that deficient performance prejudiced the defense. Third, and finally, while Petitioner reasserts various facts supporting each alleged deficiency in his reply brief, he fails to clearly identify any particular portion of the OCCA's decision that rests on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.[14] *See* Doc. 25, at 25-50; Doc. 26, at 1-19.

---

[14] For example, with respect to his argument that trial counsel failed to investigate and present evidence supporting Petitioner's defense, Petitioner asserts in his reply brief that counsel failed to utilize a supplemental offense report filed by Sergeant Chuck Jordan which, in his view, would have supported his testimony that his car was seen leaving the Oasis motel only a few days before the last bank robbery on September 9, 1999, and would have further impeached Phyllis' testimony that Petitioner wiped down Bowles' car on September 1, 1999, the day after the murders. Doc. 25, at 44; Doc. 26, at 16 *see also* Doc. 18-2, Pet'r App. for Evid. Hr'g, at 4-8. Petitioner presented this particular argument to the OCCA through his application for an evidentiary hearing on his ineffective assistance of counsel claim. *Miller II*, 313 P.3d at 1002-03; *see* Doc. 18-2, at 4-8. The OCCA rejected it, reasoning that "this report would not have made any difference at [Petitioner's] trial" because the report indicated Petitioner's car was seen near the Oasis motel at night whereas he testified he and Phyllis went to the motel on the afternoon and Phyllis testified they went to the motel in the morning. *Miller II*, 313 P.3d at 1002-03. The OCCA further reasoned, in light of the "powerful circumstantial evidence presented at trial" to establish Petitioner's guilt, "that even if defense counsel had obtained and presented this Supplemental Offense Report, there is no reasonable probability that it would have changed the result of [Petitioner's] trial" with regard to the guilt phase. *Id.* at 1003. This example supports that the OCCA carefully considered, and reasonably determined, the facts presented to it in reaching its decision on Petitioner's ineffective-assistance-of-counsel claim.

In sum, after review of the state court record, the OCCA's decision, and the parties' briefs, the Court finds nothing objectively unreasonable about the OCCA's application of *Strickland* and nothing to support Petitioner's assertion that the OCCA's rejection of his ineffective-assistance-of-counsel claim rests on an unreasonable determination of the facts. The Court thus denies habeas relief on claim two.

### C. Prosecutor's knowing use of perjured testimony (claim three)

In his third claim, Petitioner contends the prosecutor knowingly used false and perjured testimony to obtain his conviction, in violation of the Sixth, Eighth and Fourteenth Amendments. Doc. 1, at 8; Doc. 26, at 19-27. He specifically alleges that the prosecutor (1) knowingly presented "false" testimony from Sundeep Patel and (2) falsely claimed that Phyllis Miller did not receive any promises from the State in exchange for her testimony. *Id.*

A due process violation occurs when the State obtains a conviction "through the use of false evidence, known to be [false] by representatives of the State" regardless of whether the State either solicits the false evidence or simply "allows it to go uncorrected when it appears." *Napue v. Illinois*, 360 U.S. 264, 269 (1959). "A *Napue* violation occurs when (1) a government witness committed perjury, (2) the prosecution knew the testimony to be false, and (3) the testimony was material." *United States v. Garcia*, 793 F.3d 1194, 1207 (10th Cir. 2015). The first two showings necessary to establish a *Napue* violation require a reviewing court to make factual findings. *Id.* The third showing requires the reviewing court to apply a harmless-error test; specifically, "[t]he false testimony is material 'unless failure to disclose [the perjury] would be harmless beyond a reasonable doubt.'" *Id.*

(quoting *United States v. Bagley*, 473 U.S. 667, 680 (1985)).

Likewise, the prosecution's suppression of evidence favorable to the defense, including "nondisclosure of evidence affecting credibility" requires a new trial if the suppressed evidence was material. *Giglio v. United States*, 405 U.S. 150, 153-54 (1972). "[E]vidence is 'material' . . . when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. In other words, favorable evidence is subject to constitutionally mandated disclosure when it 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Cone v. Bell*, 556 U.S. 449, 469-70 (2009) (quoting *Kyles v. Whitley*, 514 U.S. 419, 435 (1995)).

The OCCA rejected Petitioner's due process claim on direct appeal. *Miller II*, 313 P.3d at 977-78. Citing *Donnelly v. DeChristoforo*, 416 US. 637, 645 (1974), and *Darden v. Wainwright*, 477 U.S. 168, 181 (1986), the OCCA stated that it would review the claim "to determine whether the challenged action so infected the defendant's trial that it was rendered fundamentally unfair, such that the jury's verdicts cannot be relied upon." *Id.* at 977-78 & n. 126. In addition, the OCCA noted that *Omalza v. State*, 911 P.2d 286, 307 (Okla. Crim. App. 1995) set out the "standard for showing [the] prosecutor knowingly

presented false or misleading evidence." *Miller II*, 313 P.3d at 978 n.139.[15]

With respect to Petitioner's claim that the State knowingly used Patel's allegedly "false" testimony, the OCCA found that Petitioner "fail[ed] to establish that Patel's retrial testimony was 'false' or that the prosecutor committed misconduct in presenting [Patel's] testimony." *Id.* at 978. With respect to the alleged "deal" with Phyllis, the OCCA found that Petitioner "failed to present any evidence that the prosecutor's statements—that the State had not made any "deal" with Phyllis and that the State had not promised her anything in exchange for her testimony—were false or misleading." *Id.*

Petitioner contends the OCCA's decision on this claim is contrary to, and involved an unreasonable application of, clearly established federal law and is based on an unreasonable factual determination. Doc. 26, at 27. Again, the Court disagrees. Despite the absence of any mention of *Napue* or *Giglio*, it is apparent from the OCCA's reference to *Omalza* and its analysis of Petitioner's claim that the OCCA recognized Petitioner's arguments as asserting a *Napue* claim with respect to Patel's testimony and a *Giglio* claim with respect to the State's alleged "deal" with Phyllis. *Miller II*, 313 P.3d at 977-78. The Court finds, therefore, that Petitioner cannot make the requisite showings under

---

[15] In *Omalza*, the OCCA stated that "[t]he knowing use of false or misleading evidence important to the prosecution's case in chief violates the Due Process Clause of the Fourteenth Amendment." 911 P.2d at 307 (quoting *McCarty v. State,* 765 P.2d 1215, 1219 (Okla. Crim. App. 1988)). It further stated that "to prove the claim on appeal the appellant bears the burden to establish (1) certain testimony was misleading, (2) the prosecution knowingly used the testimony and (3) the testimony was material to guilt or innocence." *Id.*

§ 2254(d)(1). In addition, following this Court's review of the record and the parties' briefs, the Court further finds that Petitioner cannot show, under § 2254(d)(2), that the OCCA unreasonably determined the facts in adjudicating this claim. Consequently, the Court denies habeas relief on claim three.

### D. "Pervasive" prosecutorial misconduct (claim four)

Next, Petitioner claims that "pervasive prosecutorial misconduct" deprived him of a fair trial. Doc. 1, at 10; Doc. 26, at 27-34. As he did in state court, he specifically cites the prosecutor's (1) knowing use of Patel's false testimony and failure to disclose the alleged "deal" with Phyllis (as alleged in claim three), (2) improper reference to "other crimes," (3) "unnecessarily theatrical behavior," including shouting during his cross-examination of Petitioner, (4) improper assertion of personal opinion, (5) improper appeal to juror sympathy, and (6) improper reference to a "diminished" presumption of innocence. Doc. 1, at 10-12; Doc. 26, at 27-34.[16]

To obtain federal habeas relief on a prosecutorial misconduct claim, a petitioner must show that the prosecutor's alleged misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*,

---

[16] Petitioner also reasserts his argument that the prosecutor committed misconduct by improperly arguing that a sentence less than death would be "meaningless." Doc. 1, at 11-12; Doc. 26, at 28. As Respondent points out, this alleged misconduct occurred during penalty-phase closing arguments and, in light of the fact that Petitioner no longer faces a death sentence, his claim for relief on this basis is moot. Doc. 18, at 74-75 n.41. In addition, the Court notes that the OCCA granted relief on this basis, finding both (1) that the prosecutor's "freebie" argument was improper and prejudicial and (2) that trial counsel's failure to object to that argument was deficient and "potentially prejudicial.". *Miller II*, 313 P.3d at 1000.

416 U.S. 637, 643 (1974); *see also Neill v. Gibson*, 278 F.3d 1044, 1061 (10th Cir. 2001) (noting that, "to warrant habeas relief, 'it is not enough that the prosecutors' remarks were undesirable or even universally condemned. The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to'" deny due process (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986))). To determine whether prosecutorial misconduct rendered a trial fundamentally unfair, a reviewing court must evaluate the prosecutor's conduct in the context of the entire trial and consider "the strength of the evidence against the petitioner." *Bland v. Sirmons*, 459 F.3d 999, 1024 (10th Cir. 2009).[17]

Citing the legal standard from *DeChristoforo*, the OCCA rejected Petitioner's prosecutorial misconduct claim with respect to alleged misconduct in the guilt phase of the 2008 trial. *Miller II*, 313 P.3d at 974-78. In doing so, the OCCA addressed each alleged instance of misconduct and concluded that Petitioner was not deprived of a fair trial. *Id.* The OCCA did find that the prosecutor's argument regarding "a 'diminished' presumption of innocence, during his final, first-stage closing argument" "was improper and clearly so." *Id.* at 976-77. But the OCCA concluded, in the context of the entire trial, even that improper

---

[17] Respondent cites *Paxton v. Ward*, 199 F.3d 1197, 1217 (10th Cir. 1999) for the proposition that "if the alleged prosecutorial misconduct denied the petitioner a specific constitutional right, a valid habeas corpus claim may be established without proof that the entire trial was rendered fundamentally unfair." Doc. 18, at 68. *Paxton* does state this proposition, but its statement on this point has been called into question. More recently, the Tenth Circuit has explained that the clearly established federal law with regard to prosecutorial misconduct claims is the law set forth in *DeChristoforo* which "stuck with a fundamental-fairness analysis" as the appropriate framework for analyzing such claims on habeas review. *Cuesta-Rodriguez v. Carpenter*, 916 F.3d 885, 913-14 (10th Cir. 2019).

argument did not render Petitioner's trial fundamentally unfair or render the jury's verdicts unreliable. *Id.* at 977. It reasoned that (1) defense counsel did not object to the remarks, (2) the remarks were isolated and not emphasized, and (3) that the "jury was clearly and properly instructed regarding the presumption of innocence." *Id.* In addition, the OCCA concluded that, "to the extent that the district attorney's argument could have violated [Petitioner's] right to due process or implicated any other specific constitutional rights . . . the argument was harmless beyond a reasonable doubt." *Id.*

Petitioner contends that the OCCA's rejection of his prosecutorial misconduct claim resulted in a decision (1) that was contrary to, and involved an unreasonable application of, clearly established federal law and (2) that was based on an unreasonable determination of the facts in light of the evidence presented in state court. Doc. 1, at 12; Doc. 26, at 34.

Because the OCCA clearly reviewed Petitioner's prosecutorial misconduct claim under *DeChristoforo*'s fundamental-fairness framework, Petitioner can overcome § 2254(d)(1)'s bar to habeas relief only by demonstrating that the OCCA's application of that framework was objectively unreasonable. *White*, 572 U.S. at 419; *Fairchild*, 784 F.3d at 711. And, as Respondent points out, when the governing legal principle establishes a general rule, state courts have more leeway in applying that rule. Doc. 18, at 69; *see Yarborough*, 541 U.S. at 664. Alternatively, Petitioner must show that the OCCA's rejection of his claim rests on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2). The Court has carefully reviewed the trial transcripts and considered the prosecutor's challenged remarks in light of the entire proceeding. On the record presented, the Court agrees with the OCCA's determination that Petitioner was not deprived of a fair

trial. Thus, Petitioner cannot make the requisite showings under § 2254(d), and the Court denies habeas relief on claim four.

### E.    Double punishment (claim five)

In claim five, Petitioner asserts he has been punished twice for the murders of Bowles and Thurman, in violation of the Double Jeopardy Clause, because his federal sentence, in N.D. Okla. Case No. 99-CR-125-C, rests in part on the federal district court's consideration of those murders as "relevant conduct."    Doc. 1, at 13-15.  The OCCA rejected this claim on direct appeal.  *Miller II*, 313 P.3d at 951-52.  In his reply brief, Petitioner "concedes to [the] OCCA's rejection of this claim." Doc. 26, at 34.  In light of Petitioner's concession, the Court denies habeas relief on claim five.

### F.    Admission of "other crimes" evidence (claim six)

Next, Petitioner claims the trial court erroneously admitted prejudicial "other crimes" evidence—namely, evidence that before the murders of Bowles and Thurman, Petitioner committed a string of bank and liquor store robberies with John Hanson, Petitioner's co-defendant in the double-murder case.  Doc. 1, at 16-19; Doc. 26, at 34-38.

Ordinarily, determining whether evidence was properly admitted under state law "is no part of a federal court's habeas review of a state conviction." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991).  As a result, federal habeas courts "will not disturb a state court's admission of evidence of prior crimes, wrongs or acts unless the probative value of such evidence is so greatly outweighed by the prejudice flowing from its admission that the admission denies [the petitioner] due process of law." *Knighton v. Mullin*, 293 F.3d 1165, 1171 (10th Cir. 2002) (quoting *Duvall v. Reynolds*, 139 F.3d 768, 787 (10th Cir. 1998)).

This means that a federal court's task is generally limited to determining whether, when "considered in light of the entire record, [the admission of other crimes evidence] resulted in a fundamentally unfair trial." *Id.*

Applying state law,[18] the OCCA concluded that the trial court did not abuse its discretion in admitting "other crimes" evidence to prove identity. *Miller II*, 313 P.3d at 966-67. The OCCA agreed with the trial court's assessment "that the evidence regarding [Petitioner's] involvement in the armed robberies" with Hanson was helpful to establish Petitioner's identity as one of the killers in the charged homicides and particularly helpful in establishing Petitioner's connection "to the silver .38 used to kill Thurman." *Id.* at 966. The OCCA also noted that the trial court "was quite concerned about limiting the extent of this 'other crimes' evidence and not allowing evidence that was unduly prejudicial." *Id.* at 967. The OCCA further noted that the trial court "insisted that the State focus" on presenting evidence connecting Petitioner to the murder weapon and avoid presenting "unnecessary or unduly prejudicial facts about the robberies." *Id.* In addition, the OCCA noted that the trial court provided appropriate limiting instructions to guide the jury's consideration of the other crimes evidence. *Id.* Finally, the OCCA agreed with the trial

---

[18] As with claim one, Petitioner primarily argued in state court that the admission of "other crimes" evidence violated state law. *See* Doc. 18-1, Pet'r App. Br., at 61-68. In his issue statement and the very end of his state law argument, he made passing references to the Fourteenth Amendment and the denial of "due process and a fundamentally fair trial." *Id.* at 61, 68. The Court questions whether Petitioner fairly presented claim six to the OCCA as a due process claim. However, Respondent concedes Petitioner exhausted this claim and, as further discussed below, notwithstanding any failure to exhaust, the claim fails on the merits. Doc. 18, at 85; *see* 28 U.S.C. § 2254(b)(2) (providing that habeas courts may deny relief on merits notwithstanding failure to exhaust available state remedies).

court's determination that this evidence was more probative than prejudicial, noting that "the connection between the armed robbery 'other crimes' evidence and the murder charges at issue herein is primarily the use of the same distinctive guns by the same two men acting together." *Id.* Based on its analysis, the OCCA ultimately rejected Petitioner's argument that the trial court abused its discretion in admitting the challenged evidence.

Petitioner contends the OCCA's decision on this claim is contrary to, and involved an unreasonable application of, clearly established federal law and is based on an unreasonable determination of the facts in light of the evidence presented in state court. Doc. 1, at 19; Doc. 26, at 38.

For two reasons, the Court finds that Petitioner is not entitled to federal habeas relief on claim six. First, as Respondent argues, the admission of "other crimes" evidence, or for that matter the admissibility of any evidence, even if erroneous, does not implicate the federal constitution unless the evidentiary error denied a criminal defendant of his or her right to a fundamentally fair trial. Doc. 18, at 85-86; *see Knighton*, 293 F.3d at 1171. Thus, to the extent Petitioner seeks a redetermination of whether the OCCA correctly found the evidence admissible under state law, he fails to present a cognizable habeas claim. *Estelle*, 502 U.S. at 67.

Second, to the extent Petitioner argues that it was legally or factually unreasonable for the OCCA to conclude that the admission of the challenged evidence did not violate his due process rights, the Court agrees with Respondent that the state court record does not support the alleged due process violation. Doc. 18, at 87-92. The record reflects that the trial court held a pretrial hearing on the admissibility of "other crimes" evidence on August

14, 2008. Doc. 19-8, Tr. Mot. Hr'g, at 53-69. During the trial, outside the jury's presence, the trial court reminded the State of its ruling that "other crimes" evidence should be limited to establishing Petitioner's identity. Doc. 19-18, Tr. Trial vol. 7, at 1741-50. As the OCCA noted, the trial court gave appropriate limiting instructions before each witness testified about Petitioner's involvement in various armed robberies and the trial court gave the same limiting instruction at the close of evidence. *See id.* at 1750-51, 1758; Doc. 19-17, Tr. Trial vol. 6, at 1449, 1451; Doc. 19-20, Tr. Trial vol. 9, at 2374. Finally, as the OCCA reasoned, the challenged "other crimes" evidence was relevant and more probative than prejudicial. *Miller II*, 313 P.3d at 967. On this record, Petitioner cannot establish that the OCCA's implicit rejection of his due process claim is "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

For these reasons, the Court denies habeas relief on claim six.

### G.      Violation of Interstate Agreement on Detainers (claim seven)

Finally, Petitioner claims that the trial court lacked "jurisdiction" over his state criminal case because the State violated the anti-shuttling provision of Article IV of the Interstate Agreement on Detainers (IAD). Doc. 1, at 20-23; Doc. 26, at 39-48.

The IAD is an interstate compact entered into by the compacting states with the consent of Congress. *See Cuyler v. Adams*, 449 U.S. 433, 438-42 (1981). As such, it is a law of the United States that is subject to federal construction. *Id.*; *see Carchman v. Nash*, 473 U.S. 716, 719 (1985) ("The [IAD] is a congressionally sanctioned interstate compact within the Compact Clause, U.S. Const., Art. I, § 10, cl. 3, and thus is a federal law subject

to federal construction."). Both the United States and Oklahoma are party "States" to the IAD. *See* IAD § 2, 18 U.S.C. App. 2; OKLA. STAT. tit. 22, § 1347. The IAD "creates uniform procedures for lodging and executing a detainer, i.e., a legal order that requires a State in which an individual is currently imprisoned to hold that individual when he has finished serving his sentence so that he may be tried by a different State for a different crime." *Alabama v. Bozeman*, 533 U.S. 146, 148 (2001). When a receiving state has lodged a detainer against a prisoner, the IAD authorizes transfer of a prisoner from a sending state to a receiving state upon presentation of a written request for temporary custody. *See* IAD § 2, at Art. IV(a).

In addition, the IAD protects the prisoner from excessive transfers through the so-called anti-shuttling provision. *See* IAD § 2, at Art. IV(e). That provision states:

> If trial is not had on any indictment, information, or complaint contemplated hereby prior to the prisoner's being returned to the original place of imprisonment to article V(e) hereof, such indictment, information, or complaint shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice.

*Id.* The anti-shuttling provision is violated "when a prisoner, who is serving a sentence in the sending state and indicted by the receiving state, is (1) transferred to the receiving state based on its lodging a detainer against him and requesting custody, *id.* at Art. IV(a), and then (2) returned to the "original place of imprisonment" before standing trial on the untried indictment, *id.* at Art. IV(e). *United States v. Pursley*, 474 F.3d 757, 762 (10th Cir. 2007).

However, the provisions of the IAD are not triggered unless a detainer is filed with the sending state by a receiving state having *untried* charges pending against the prisoner. *United States v. Mauro*, 436 U.S. 340, 343-44 (1978). In *Mauro*, the Supreme Court noted

that the IAD does not define the term "detainer," but drew the following explanation of that term from legislative materials: "[a] detainer is a notification filed with the institution in which a prisoner is serving a sentence, advising that he is wanted to face pending criminal charges in another jurisdiction." *Mauro*, 436 U.S. at 359; *cf. Carchman*, 473 U.S. 716, 724 (1985) (concluding that Article III of the IAD "by its terms applies to detainers based on 'any untried indictment, information or complaint'" and further concluding "that a detainer based on a probation-violation charge is not a detainer based on "any untried indictment, information or complaint," within the meaning of Art. III.").

Significantly, even if a state prisoner establishes a violation of the IAD, the prisoner is not necessarily entitled to federal habeas relief. Rather, "only 'special circumstances' permit collateral attack for violations of the IAD." *Knox v. Wyo. Dep't of Corr. State Penitentiary Warden*, 34 F.3d 964, 967 (10th Cir. 1994). Thus, unless a prisoner describes a violation of the IAD "that qualifies as 'a fundamental defect which inherently results in a complete miscarriage of justice, [or] an omission inconsistent with the rudimentary demands of fair procedure,'" the prisoner fails to state a cognizable habeas claim. *Id.* at 968 (quoting *Reed v. Farley*, 512 U.S. 339, 348 (1994)).

### 1.      Additional facts

Proper consideration of this claim requires a brief discussion of the facts that were presented in the relevant state court proceeding. The record reflects that before Petitioner's 2008 trial, he moved to dismiss the murder charges on the basis of an alleged violation of the IAD's anti-shuttling provision. Doc. 18-13, at 6. After the trial court denied the motion, Petitioner sought a writ of prohibition from the OCCA. *Id.* at 6-7. In his petition

for the writ of prohibition (Doc. 18-13), Petitioner set forth the following supporting facts:

- On September 9, 1999, Petitioner was arrested and taken into custody by federal authorities. The next day he was charged, in N.D. Okla. Case No. 99-CR-125-C, with bank robbery and possession of a firearm during a crime of violence. A second superseding indictment, charging 17 counts, was filed November 3, 1999.

- On September 22, 1999, the State charged Petitioner with two counts of first-degree murder in the District Court of Tulsa County, Case No. CF-1999-4583. The state trial was delayed pending the federal prosecution.

- On January 6, 2000, Miller was convicted in federal court on all counts charged in the second superseding indictment. The federal district court sentenced Petitioner on June 16, 2000, and Petitioner was transported to USP-Leavenworth to commence his federal sentence.

- On August 29, 2000, following its mandatory review of Petitioner's record, the Federal Bureau of Prisons (BOP) sent a Detainer Action Letter to the Tulsa County Sheriff's Office, inquiring whether it wanted to place a detainer on Petitioner.[19]

- The State secured Petitioner's presence for his first trial, in April 2002, through a writ of habeas corpus *ad prosequendum*. On June 17, 2002, the state trial court sentenced Petitioner in accordance with the jury's verdicts. Petitioner was then returned to federal custody.

- On October 30, 2002, the BOP sent a Detainer Action Letter to the Tulsa County

---

[19] *See* Doc. 18-6 (Detainer Action Letter, dated August 29, 2000).

Sheriff's Office, (1) confirming that a detainer had been filed against Petitioner "charging: 1st Degree Murder (Sentence to Death), and (2) stating that Petitioner's tentative release from federal prison was "LIFE."[20]

- On September 17, 2004, the OCCA reversed Petitioner's convictions and sentences in Tulsa County Case No. CF-1999-4583, and remanded the case for a new trial.

- On November 19, 2004, the Tulsa County District Attorney's Office requested and obtained a writ of habeas corpus *ad prosequendum* directing the BOP to return Petitioner to Tulsa County for retrial.[21]

- On November 23, 2004, the Tulsa County Sheriff's Office requested that the BOP remove the detainer against Petitioner. The BOP removed the detainer the next day.[22]

- Petitioner was returned to Tulsa County on November 30, 2004.

- Several pretrial proceedings took place and, on March 20, 2006, Petitioner waived his right to a speedy trial, and the trial court granted his request for an 8-month continuance.

- Petitioner was immediately returned to federal custody.

- On March 1, 2007, Petitioner moved to dismiss the murder charges, alleging a violation of the IAD's anti-shuttling provision. Following a hearing, the trial court

---

[20] *See* Doc. 18-8 (Detainer Action Letter, dated October 30, 2002).
[21] *See* Doc. 18-9 (Writ)
[22] *See* Doc. 18-10 (Detainer Action Letter, dated November 24, 2004)

denied the motion.[23]

- Petitioner then sought a writ of prohibition in the OCCA, reasserting his allegation that the State violated the anti-shuttling provision.

- By Order dated September 26, 2007, in Case No. PR-2007-637, the OCCA denied Petitioner's application for extraordinary relief. Doc. 18-15, *Miller v. Kuehn*, No. PR-2007-0637 (Okla. Crim. App. 2007) (unpublished), at 1-5.

### 2.    Analysis

As he did in state court, Petitioner alleges (1) that the State lodged a detainer with the BOP in 2002, (2) that the 2002 detainer became a detainer for untried charges on September 17, 2004, when the OCCA reversed his convictions and sentences, (3) that the State triggered provisions of the IAD on November 19, 2004, when it secured his appearance at his second trial through a writ of habeas corpus *ad prosequendum*, and (4) that the State violated the anti-shuttling provision when it returned him to federal custody in 2006 before his second trial was complete. Doc. 1, at 20-23; Doc. 26, at 39-48.

The OCCA considered and rejected Petitioner's IAD claim. The OCCA reasoned,

> The provisions of the Interstate Agreement on Detainers set forth at Section 1347 of Title 22 have not been triggered in this case. The detainer in place before Petitioner's conviction was reversed and remanded for a new trial by this Court was pursuant to a State conviction. It was not based on untried charges and, therefore, subject to the Interstate Agreement on Detainers. This detainer was removed when Petitioner's State conviction was reversed and remanded for a new trial. Petitioner was subsequently returned to the State's custody for retrial pursuant to a writ of habeas corpus *ad prosequendum*. The writ of habeas corpus *ad prosequendum* is not a detainer for purposes of the Interstate Agreement on Detainers. *United States v.*

---

[23] *See* Doc. 19-5, Tr. Mot. Hr'g (May 24, 2007).

*Mauro*, 436 U.S. 340, 361, 98 S. Ct. 1834, 1848 56 L. Ed. 2d 329 (1978).
Doc. 18-15, at 4. Because the OCCA found Petitioner failed to establish a violation of the IAD's anti-shuttling provision, the OCCA denied Petitioner's application for a writ of prohibition. *Id.*

For two reasons, the Court finds that Petitioner is not entitled to habeas relief on claim seven. First, applying *Knox*, the Court agrees with Respondent that Petitioner fails to identify any "special circumstances" that would render the alleged IAD violation subject to collateral attack or federal habeas relief. Doc. 18, at 92-97; *see Knox*, 34 F.3d 967. Second, even assuming Petitioner presents a cognizable habeas claim, he cannot make the requisite showings under § 2254(d) to obtain habeas relief. Having reviewed Petitioner's supporting facts and the state court record relevant to his alleged IAD violation, the Court agrees with the OCCA's reasonable factual determination that Petitioner failed to establish that the IAD was "triggered in this case," let alone that it was violated. Doc. 18-15, at 4. As the OCCA reasoned, the only detainer lodged against Petitioner by the State, through the Tulsa County Sheriff's Office, was the 2002 detainer lodged after Petitioner was sentenced following his first trial. That detainer was not a "detainer" within the meaning of the IAD because it was not based on untried charges. *See Mauro*, 436 U.S. at 343-44. Rather, the purpose of the 2002 detainer was to notify the BOP that, upon release from federal prison, Petitioner had state sentences, one of which was a death sentence, to be served in Oklahoma. *See* Doc. 18-8. Further, contrary to Petitioner's position, the OCCA's 2004 decision reversing his convictions and sentences did not transform the 2002 sentencing detainer into detainer on untried criminal charges, thereby triggering the IAD.

44

Finally, the OCCA reasonably applied *Mauro* to determine that the State did not trigger the IAD by seeking Petitioner's presence at trial through writs of habeas corpus *ad prosequendum.* *See Mauro*, 436 U.S. at 349 (holding that "such a writ is not a detainer within the meaning of the [IAD] and thus does not trigger the application of the [IAD]").

For these reasons, the Court denies habeas relief on claim seven.

## CONCLUSION

Based on the foregoing analysis, the Court concludes that Petitioner is not entitled to federal habeas relief on any of the claims he presents in his habeas petition. The Court therefore denies his petition for a writ of habeas corpus.

### Certificate of Appealability

Rule 11, *Rules Governing Section 2254 Cases in the United States District Courts*, requires a district court to "issue or deny a certificate of appealability when it enters a final order adverse to the [petitioner]." The court may issue a certificate of appealability "only if the [petitioner] has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When the court rejects a petitioner's constitutional claims on the merits, the petitioner must make this showing by demonstrating "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Because the Court finds that reasonable jurists would not debate the correctness of its assessment of petitioner's federal claims, the Court declines to issue a certificate of appealability.

**ACCORDINGLY, IT IS HEREBY ORDERED** that:

1.     The Clerk of Court shall note on the record the substitution of Joe Allbaugh in place

of Jerry Chrisman as party respondent.

2.     The petition for a writ of habeas corpus (Doc. 1) is **denied**.

3.     A certificate of appealability is **denied**.

4.     A separate judgment shall be entered in this case.

ORDERED this 29th day of March 2019.


JOHN E. DOWDELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT